BROWN, Circuit Judge,
concurring:
I fully join the per curiam decision, but I write separately to observe that there is much to be said for Petitioners’ argument that EPA should not be permitted to base NESHAP standards on bare emissions data, and that EPA should instead isolate the effect of emissions control technology by controlling for input quality. Because kilns are co-located with raw material quarries and because there is significant variability in the pollutant content of those raw materials, a kiln may have low emissions simply because it happens to be blessed with good inputs, not because it is using a superior control technology. But when the CAA directs EPA to set floors based on “the emission control that is achieved in practice by the best controlled similar source,” 42 U.S.C. § 7412(d)(3) (emphases added), it would seem to be specifically directing EPA’s attention to the active steps a kiln has taken to “control” its emissions, not simply to the level of emissions itself. In addition to the text, the structure .of the statute also suggests that the quality of inputs should not be permitted to affect the calculation of *195 floors: the “substitution of materials” — in other words, the degree to which EPA can require kilns to switch inputs in order to comply with a standard — is listed as a factor to be considered in the second, beyond-the-floor determination, not in the antecedent floor-setting determination. Id. § 7412(d)(2)(A).
As the per curiam decision notes, however, this argument has already been rejected by the Court in Sierra Club v. EPA, 479 F.3d 875, 883 (D.C.Cir.2007), and that decision controls, Maxwell v. Snow, 409 F.3d 354, 358 (D.C.Cir.2005). I am simply puzzled as to how we arrived at our conclusion. First, the text and structure of the statute seem to me to compel the opposite result. Second, Sierra Club relied on our holding in National Lime Ass’n v. EPA, 233 F.3d 625, 640 (D.C.Cir.2000), that the CAA does not require “that [the] achievement ... be the product of a specific intent.” But I do not read National Lime to have held that the achievement need not be the product of any intent. Instead, context reveals that the National Lime Court was referring to emissions of one sort that are “controlled only incidentally by controls placed upon” another sort of emission. Id. The incidental control of one emission as the result of controlling another still certainly counts as an “achievement” of emission control. But the Court did not state — or even imply — that emissions levels determined by inputs alone count as an “achievement” of emission control within the meaning of the statute.
Senior Judge Williams concurred in Sierra Club to “note a paradox in the relationship between two key provisions of § 112 of the Clean Air Act”:
What if meeting the “floors” is extremely or even prohibitively costly for particular plants because of conditions specific to those plants (e.g., adoption of the necessary technology requires very costly retrofitting, or the required technology cannot, given local inputs whose use is essential, achieve the “floor”)? For these plants, it would seem that what has been “achieved” under § 112(d)(3) would not be “achievable” under § 112(d)(2) in light of the latter’s mandate to EPA to consider cost.
479 F.3d at 884 (Williams, J., concurring) (emphasis added). He was quite right that ignoring input quality when determining the floors subverts the statutory scheme by allowing EPA to establish a floor that some kilns simply cannot meet. The CAA permits EPA to do this at the “beyond-the-floor” stage as long as it considers the relevant costs, but the very existence of that secondary phase indicates that EPA should not be permitted to set a standard at the floor-setting stage which is unachievable due to input quality.
But it was our decision, not Congress’s, to demand that EPA ignore input variability when it sets emissions floors. It was our decision to not only permit but to require EPA to ignore the costs of achieving those floors — to enact them, in other words, even if some kilns would never be able to meet them. Because of our decision, these “maximum achievable control technology” floors have little to do with achievability, controls, or technology, even though, as Senator Domenici stated during the consideration of this law, the “initial level of tight controls ... is [to be] determined strictly on the basis of the availability of technology.” 136 Cong. Rec. S17,-120-24 (daily ed. Oct. 26, 1990) (statement of Sen. Pete Domenici).[1]
*196 In contrast to our interpretation, the Congress that enacted the current NESHAP program in 1990 was quite concerned about the costs of regulation — -and those costs presumably included the economic impact of putting going concerns out of business. The straightforward text and structure of the floor-setting provisions convey as much. Moreover, Congress included a specific requirement in the 1990 Amendments that EPA prepare a “comprehensive analysis” of the “costs, benefits and other effects associated with compliance” with, among other things, NESHAP standards. 42 U.S.C. § 7612(a). Speaking in support of this provision and of cost-benefit analysis more generally, Senator Moynihan described the Amendments as “the first environmental legislation in history to require extended and intensive cost benefit analysis” and said, “Until now, we have too often feared facts. This fear has not served [us] well. Environmental programs that prohibit the EPA from taking the costs of compliance into account have, more often than not, resulted in deadlock.” 136 Cong. Rec. S16,895-97 (daily ed. Oct. 27, 1990) (statement of Sen. Daniel Patrick Moynihan). It would be strange indeed if a Congress so attuned to the importance of cost-benefit analysis intended EPA to set emissions floors regardless of the cost. Congress sought to constrain the agency’s discretion; we decided to set it free.
The truth is that this is no unavoidable paradox: the statute’s use of terms like “achieved” and “controlled” at the floorr setting stage urges EPA to focus on what sources have actually done to ameliorate the pollution caused by their particular set of inputs. If the outcome of that analysis is not strong enough for EPA’s satisfaction, the statute’s “beyond-the-floor” procedures provide it with an outlet to set stricter standards, so long as it considers the costs of that course of action. Congress’s very provision of this beyond-the-floor mechanism and its persistent attention' — reflected elsewhere in the statute and in the legislative history — to the importance of cost-benefit analysis only bolster this clear reading of the text. Our holding in Sierra Club was a self-inflicted wound, and the result of a series of interpretive leaps that I simply cannot follow. I regret that we have ignored Congress’s wishes and made life more difficult — for industry and its employees, for EPA, and for ourselves.

. In fact, EPA's own website also refers to the standards as “technology-based,” rather than emissions-based. Envtl. Prot. Agency, Summary of the Clean Air Act, http://www.epa.gov/ lawsregs/laws/caa.html (last visited Nov. 7, 2011).